UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

MARY ANN PYBURN,                    )
                                    )
            Plaintiff,              )
                                    )       No. 1:10-CV-172
v.                                  )
                                    )       *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
            Defendant.              )

## REPORT AND RECOMMENDATION

Plaintiff Mary Ann Pyburn ("Plaintiff") was denied disability insurance benefits ("DIB") and

supplemental security income ("SSI") by the Commissioner of Social Security ("Commissioner" or

"Defendant"), and she now appeals that denial.[1]  Plaintiff contends that the Administrative Law

Judge ("ALJ") who heard her claim erred in dismissing her allegations of fibromyalgia, by rejecting

the opinion of her treating physician, and by improperly evaluating her subjective complaints of pain.

Plaintiff has moved for summary judgment, seeking reversal of the Commissioner's decision and

an award of benefits [Doc. 11].  In the alternative, Plaintiff moves to remand her case for the

consideration of new evidence [Doc. 12].  Defendant, in response, has moved for summary judgment

[Doc. 16].  For the reasons stated below, I **RECOMMEND** that Plaintiff's motion for summary

judgment [Doc. 11] be **DENIED**; her motion for sentence-six remand [Doc. 12] be **DENIED**;

Defendant's motion for summary judgment [Doc. 16] be **GRANTED**; the decision of Commissioner

be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

---

[1] This action is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), which, respectively provide for judicial review of the final decision of the Commissioner denying DIB and SSI benefits.

# I. ADMINISTRATIVE PROCEEDINGS

In November 2006, at the age of 44, Plaintiff applied for DIB and SSI benefits, alleging disability since June 2005 due to a deteriorated disc, irritable bowel syndrome, ADHD, anxiety, and depression (Tr. 105, 116, 121). After Plaintiff's claim was denied, she asked for reconsideration, adding complaints of numb legs and pain in her extremities, but her claim was denied again on reconsideration (Tr. 50-57). Plaintiff requested a hearing, which was held in May 2008 (Tr. 31, 69). By decision dated June 25, 2008, the ALJ determined that Plaintiff was not disabled (Tr. 13-24). In March 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-5).

# II. DISABILITY DETERMINATION PROCESS

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

Rabbers v. Comm'r of Soc. Sec., 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of

proof at the first four steps.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**III.    FACTUAL BACKGROUND AND ALJ'S FINDINGS**

**A.    Plaintiff's Allegations of Disability and Hearing Testimony**

Plaintiff, who has a seventh grade education, was employed continuously between 1979 and 2006, first as an agricultural worker, then as a housemaker, cabinet assembler, and a private sitter (Tr. 126, 140).  She was a certified nursing assistant ("CNA"), and she wanted to get her GED so that she could become a nurse (Tr. 181).  Plaintiff alleged that she stopped working in June 2006, however, because she "could no longer do the job" (Tr. 121).  When she first applied for benefits, Plaintiff's chief complaint was "constant" back and right leg pain, but she also alleged she could not eat or drink due to "constant diarrhea" (Tr. 121, 136).  She explained that she had experienced pain since 2000, but it had begun to affect her activities only since 2004 and had become "this bad" only since 2005 (Tr. 136-38).  Plaintiff alleged she could not walk or bend and could not sit or lie down for "too long" (Tr. 121).  She also alleged she had recently been prescribed a cane, which she used "all the time" (Tr. 134), and took a variety of pain medications, which did "very little" to relieve her pain (Tr. 136).

Later on, during her appeal of the agency's decision, Plaintiff gave an updated report of her condition.  She alleged she had "gotten worse." (Tr. 161).  She stated that she was experiencing elbow pain that ran to her wrists and back pain that radiated to her right arm and leg (Tr. 156).  Her right leg would also go "numb," causing her to turn her ankle, lose her balance, and fall (Tr. 156, 161).  As a result, Plaintiff stated she had been prescribed a walking cane and a motorized wheelchair (Tr. 161).  Furthermore, she alleged that her "whole body" hurt "real bad," prompting her to visit R. Lee Kern, Jr., M.D., in April 2007, for a surgical consultation (Tr. 177-79).  She

described "sharp pains" affecting both bones and muscles in her legs, shoulders, and back (Tr. 180). Plaintiff reported that Dr. Kern told her that surgery would not help her pain because she had fibromyalgia (Tr. 177-79).[2]

Plaintiff described how her physical complaints affected her daily life. She lived with her mother and daughter, and she cared for her daughter by waking her, taking her to school, and brushing her hair (Tr. 128-29, 131). Plaintiff tried to do household chores, but it hurt her to stoop down (Tr. 128). She folded clothes sometimes, but she did not cook (Tr. 130). At the hearing, Plaintiff testified she could sit without interruption for 15 minutes, stand for ten minutes, and walk the length of a room, but not a city block (Tr. 38). She also reported an inability to concentrate (Tr. 129-30). In addition, Plaintiff described non-physical complaints, which are not directly at issue in this appeal: depression and anxiety around "a lot of people" severe enough to "take [her] breath[]" away (Tr. 36-37, 130-31).

**B.      Evidence in the Record Before the ALJ**

As explained below, Plaintiff raises several challenges to the ALJ's decision. All of them, however, relate in some way to two alleged impairments—back pain and fibromyalgia. For that reason, this summary of the facts will focus on those impairments and will not include a summary of the evidence of Plaintiff's gastrointestinal complaints or mental impairments.

---

[2] As explained more fully below, Dr. Kern's treatment note from that appointment does conclude that Plaintiff was not a good surgical candidate, but it does not mention fibromyalgia (Tr. 361).

### 1.    Plaintiff's Treatment History

#### a.    Back Pain

The bulk of Plaintiff's medical records are dated 2006 and later.[3]  Nevertheless, the medical records do contain Plaintiff's own account of the genesis of her back problems.  She told Jerry L. Smith, M.D., that she did not recall a single injury, but she had performed "a lot of heavy labor" (Tr. 330).  While working as a CNA, Plaintiff stated her back pain caused her difficulty in lifting patients (Tr. 234).  Dr. Kern described Plaintiff's "chronic" low back pain, which had been present since 2000 but had gotten worse during the latter half of 2006 (Tr. 209).

In October 2006, Plaintiff saw Roger T. Nelson, M.D., who noted that Plaintiff's back was "tender" and painful with movement (Tr. 295, 297), and recommended an MRI and steroid injection (Tr. 295).   Plaintiff received an MRI several days later, which showed "minimal hypertrophic changes . . . at the vertebral margins" and mild spinal stenosis at the L4-L5 and L5-S1 levels along with moderate to severe narrowing at the L5-S1 level (Tr. 293-94, 296).   Dr. Nelson prescribed Lortab, but although Plaintiff complained that it did not help, she refused any epidural injections at that time (Tr. 289, 291).  Dr. Nelson referred Plaintiff to Dr. Kern, a neurosurgeon (Tr. 206, 289).

Plaintiff saw Dr. Kern in November 2006, at which time Plaintiff had no numbness, weakness, or difficulty walking (Tr. 209-210).  Although her straight-leg raise test[4] was negative, Dr. Kern diagnosed Plaintiff with lumbar radiculopathy and spondylosis based on her MRI results (Tr. 210-11).  Dr. Kern "considered" surgery as an option but instead prescribed a back brace,

---

[3] Earlier records from a treating physician do not address the complaints at issue in this appeal (Tr. 303-27).

[4] A straight-leg raise test checks for radiculopathy, or damage to spinal nerves.  *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254, *4 n.1 (6th Cir. 2011) (unpublished).

physical therapy, anti-inflammatory medication, and Flexeril (Tr. 211, 330, 362).  Plaintiff reported that neither the Flexeril nor the back brace helped, and she attended only a single physical therapy session before stopping because her pain increased (Tr. 330).  Still, Plaintiff was "apprehensive" about surgery, so Dr. Kern referred her for pain management and an epidural injection (Tr. 362).

In January 2007, Dr. Nelson noted that Plaintiff's back was "tender," and he prescribed a wheelchair at Plaintiff's request (Tr. 279-81).  A few days later, Plaintiff visited the emergency room with back pain after twisting her back (Tr. 232).  She received X-rays of the lumbar spine which, like the MRI, showed a narrowing of the L5-S1 disc space with "minimal hypertrophic changes at the vertebral margins" (Tr. 232).  Despite her professed fear of needles (Tr. 237), Plaintiff received an epidural injection from Stephen V. Dreskin, M.D., a few days after her emergency room visit (Tr. 233).  Later, in April 2007, Plaintiff received three more epidural injections from Dr. Dreskin (Tr. 370).

In February 2007, Plaintiff received an initial pain management evaluation by Dr. Smith (Tr. 330-31).  Dr. Smith's physical examination revealed that Plaintiff was "very tender" in the lumbar area and had "some tenderness" in the cervical area (Tr. 330).  Sensation was "[d]ecreased throughout the right foot." (Tr. 330).  Dr. Smith described Plaintiff's sensitivity to pain medications: she did not tolerate OxyContin, Kadian, Ultram, or Darvocet, and Flexeril reportedly did not help (Tr. 330).  Plaintiff was also allergic to Codeine (Tr. 327).  Accordingly, Dr. Smith prescribed different medications, including Percocet (Tr. 331).  Another physician at Dr. Smith's clinic noted in September 2007 that Plaintiff had limited lumbar flexion and extension with pain (Tr. 400).  That same month, Bill Stevens, D.O., performed a physical examination in which Plaintiff's neck was supple, her range of motion in her extremities was normal, and she had no motor or sensory deficits

(Tr. 433).

In February 2008, Plaintiff fell, and her fall exacerbated her back pain (Tr. 426). She told an emergency room nurse that her leg went numb "all the time," and the numbness had caused her fall (Tr. 426). An X-ray showed "severe" narrowing of the disc space at L5-S1 due to her degenerative disc disease (Tr. 430). Plaintiff was walking with a cane when she visited the emergency room (Tr. 425). She visited the emergency room again in March 2008, with a headache and pain (Tr. 548). An MRI of her lumbar spine showed mild/moderate disc herniation at L5-S1 and mild herniation at L4-5, with mild foraminal narrowing at both levels (Tr. 550).

### b. Evidence of Fibromyalgia

The record does not contain an unequivocal fibromyalgia diagnosis, denominated as such. It does, however, show suspicions of, evaluations for, and treatment of fibromyalgia. In 2007, Plaintiff's complaints of pain became more widespread. In March 2007, Dr. Nelson noted chronic joint pain at numerous sites, so Plaintiff was scheduled for a bone density scan, the results of which were "within normal limits" (Tr. 376, 526). On April 6, 2007, Plaintiff returned to Dr. Kern with a new symptom; her pain had moved into her left leg (Tr. 361). Because of the "changing nature of her pain and the appearance of her imaging studies," Dr. Kern told Plaintiff she was not a good surgical candidate (Tr. 361). He recommended that she continue with pain management with Dr. Smith (Tr. 361). As noted above, Plaintiff told the SSA that Dr. Kern informed her at this appointment that she was not a good surgical candidate because she had fibromyalgia (Tr. 177), but Dr. Kern's treatment note does not actually mention fibromyalgia. Plaintiff also told Dr. Smith on April 11, 2007, that she had been diagnosed with fibromyalgia (Tr. 411), and at subsequent appointments with Dr. Smith, Plaintiff's pain management plan listed fibromyalgia as one of the

conditions for which Plaintiff was receiving treatment (Tr. 402, 404, 406, 409).

On April 27, 2007, Dr. Nelson noted that all Plaintiff's muscles were "sore to pressure," and he recorded an "imp[ression]" of fibromyalgia (Tr. 523). Consequently, he referred Plaintiff to Michael L. Brit, M.D., a rheumatologist, for evaluation (Tr. 370-71, 523, 526). Dr. Brit saw Plaintiff on May 14, 2007, for an "evaluation of pain all over and *question* of fibromyalgia." (Tr. 370) (emphasis added). At that time, Plaintiff complained of severe pain and fatigue (Tr. 370). On examination, Dr. Brit observed that Plaintiff had "diffuse tenderness to palpation" along her spine and her straight-leg test was positive bilaterally (Tr. 371). It was Dr. Brit's impression that Plaintiff suffered from degenerative disc disease and "diffuse somatic pain syndrome with multiple tender points suggestive of fibromyalgia" (Tr. 371). At her appointment with Dr. Brit, Plaintiff walked with the help of a cane (Tr. 371). In addition, a note from Dr. Nelson's clinic dated May 2, 2007, refers to a diagnosis of fibromyalgia by a doctor whose name is illegible (Tr. 526).

In September 2007, Plaintiff was examined by Steven Musick, D.O., who practiced with Dr. Smith (Tr. 399-400). In his assessment, Dr. Musick listed degenerative disc disease and "[f]ibromyalgia history," and he found that Plaintiff had "myofascial soft tissue pain to multiple points in her back and paravertebral area basically from the cervical spine down to the lumbar spine" (Tr. 400). Dr. Musick suggested medications that he believed might help Plaintiff's radiculitis and fibromyalgia (Tr. 400). In October 2007 and March 2008, Plaintiff complained of pain "all over" (Tr. 397, 550). She reported that Percocet was not effective, but she was getting "some relief" from Oxycodone (Tr. 393). A treatment note from Dr. Nelson which is undated, but which appears to have been recorded sometime in early 2008, lists fibromyalgia as a diagnosis (Tr. 511).

## 2.     Medical Opinions in the Record

Thomas Mullady, M.D., performed a consultative examination in January 2007, which, as Plaintiff points out, was several months before she began receiving treatment for fibromyalgia (Tr. 234-36). Dr. Mullady noted that Plaintiff's X-rays and MRI showed mild osteoarthritis, disc bulging at L4-5 and L5-S1, and mild spinal stenosis at those same levels (Tr. 234). He observed that Plaintiff did not limp, but she walked slowly, with short steps, and could not walk without the use of a quad cane for balance (Tr. 235-36). Dr. Mullady noted that Plaintiff climbed and descended the examining table "very slowly . . . with complaints of low back pain." (Tr. 235). Plaintiff also had a "marked decrease" in flexion and extension of the lumbar spine, and straight leg raising was permitted to 80 degrees in the supine position (Tr. 235). Dr. Mullady opined Plaintiff could lift ten pounds occasionally but no amount of weight frequently, and with normal breaks, she could stand for two hours and sit for six hours in an eight-hour workday (Tr. 236).

Later that same month, James B. Millis, M.D., a reviewing consultant, offered an opinion based on Dr. Mullady's examination and his own review of Plaintiff's medical records (Tr. 251-58). Dr. Millis found Dr. Mullady's assessment to be "overly restrictive" (Tr. 257). Dr. Millis opined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and she could stand or sit six hours out of a normal workday (Tr. 252). Dr. Millis stated that the "medical imaging reports" did not show a need for a cane, and he concluded that Plaintiff's complaints were "not completely credible" (Tr. 256). About a week after Dr. Millis offered his opinion, Plaintiff's claim for benefits was denied at the first level of administrative review. Corresponding to Plaintiff's request for reconsideration of that initial decision, Nathaniel Robinson, M.D., reviewed Plaintiff's file again in March 2007 (Tr. 334-41). Dr. Robinson's opinion was substantially identical to Dr. Millis's.

In May 2008, only three days before the hearing before the ALJ, Dr. Smith offered a medical opinion as Plaintiff's treating physician (Tr. 620-23). Dr. Smith's assessment was much more restrictive. He stated that Plaintiff could not walk or stand without her quad cane, and he opined that Plaintiff's subjective complaints were reasonable in light of his observations and diagnoses (Tr. 621). Dr. Smith further opined Plaintiff could rarely lift any amount of weight, and he described a variety of postural limitations (Tr. 620). During a normal workday, Dr. Smith believed Plaintiff could sit for six hours, but only 15 minutes at a time, and she could stand for one-half hour, but only five minutes at a time (Tr. 620). He also believed Plaintiff would need an hour's bed rest during a normal workday, and she would need 15 minutes of rest for every hour worked (Tr. 621). Dr. Smith characterized Plaintiff's pain as "moderately severe," and opined that it would affect her concentration or memory (Tr. 622). In addition, two of her medications caused drowsiness (Tr. 622). Put simply, Dr. Smith did not believe Plaintiff could reasonably be expected to reliably attend an eight-hour-day, 40-hour-week job (Tr. 621).

### C.      ALJ's Findings

At step one, the ALJ found that Plaintiff was not working (Tr. 15). At step two, the ALJ found that Plaintiff had three severe impairments: degenerative disc disease, affective disorder, and anxiety (Tr. 15). The ALJ acknowledged that Dr. Brit's findings were "suggestive of fibromyalgia," but declined to find that as a severe impairment (Tr. 19). At step three, the ALJ found that none of Plaintiff's impairments met the criteria of any listed, presumptively disabling impairment (Tr. 19). The ALJ found that Plaintiff retained the RFC to perform unskilled sedentary work with a sit/stand option and one-step procedures (Tr. 21). In assessing Plaintiff's RFC, the ALJ gave great weight to the opinion of Dr. Mullady, the consultative examiner, but found Dr. Smith's opinion to be "too

10

restrictive" (Tr. 23).  With this RFC, the ALJ found at step four that Plaintiff could not perform any

of her past work (Tr. 23).  The ALJ relied on a vocational expert's testimony[5] to conclude at step five

that Plaintiff could perform other work (Tr. 23).  Accordingly, he found that Plaintiff was not

disabled (Tr. 24).

### D.     Evidence Submitted to the Court

The new evidence submitted by Plaintiff consists of three medical opinions.  The first is

another consultative examination by Dr. Mullady [Doc. 15 at 5-7], the second is a treating physician

statement from Dr. Nelson [Doc. 15 at 8-10], and the third is an RFC questionnaire completed by

Riley Senter, M.D. [Doc. 15 at 11-14].  Dr. Mullady's opinion is dated December 2009, after the

ALJ's decision but before the Appeals Council denied review.  Dr. Mullady acknowledges Plaintiff's

diagnosis of fibromyalgia "characterized by generalized aches and pains" [Doc. 15 at 5].  Dr.

Mullady once again stated that Plaintiff could not walk without her cane and noted that she also used

a wheelchair [Doc. 15 at 7].  He opined Plaintiff could occasionally lift up to ten pounds, and she

could stand for less than two hours and sit for at least six hours during a workday [Doc. 15 at 7].

Dr. Nelson's opinion, dated May 2010, is quite restrictive.  He noted that she needed help

getting out of bed and could not walk [Doc. 15 at 8].  Like Dr. Smith, Dr. Nelson characterized

Plaintiff's pain as "moderately severe" and he believed that her subjective complaints were

---

[5] During the hearing, the vocational expert ("VE") testified that a person with Plaintiff's age,
experience, education, and with the RFC found by the ALJ, could perform jobs such as
"inspector/mender" and "bonder operator" (Tr. 24, 42).  The VE also testified, however, that if
Plaintiff's testimony were found to be credible or if the ALJ accepted Dr. Smith's opinion, Plaintiff
would be incapable of performing any work (Tr. 42-43, 45-46).  As the Commissioner points out,
the ALJ found Plaintiff's ability to work was limited to "one-step procedures" but the hypothetical
posed to the VE limited Plaintiff to "simple one and two-step procedures."  Plaintiff has not
challenged this minor discrepancy, and the argument is therefore waived.

reasonable in light of his observations and diagnoses [Doc. 15 at 9]. He opined Plaintiff could not lift any amount of weight [Doc. 15 at 8]. He stated she was "unable to work": she would need four hours of bed rest per day; she used a wheelchair; and her condition would cause lapses in concentration or memory "every day" [Doc. 15 at 10].

Dr. Senter's opinion, dated August 2010, states that Plaintiff needed her cane to walk and could walk less than the length of a city block [Doc. 15 at 11, 12]. Plaintiff was restricted to sitting or standing less than two hours per day, and even then, only ten minutes at a time [Doc. 15 at 11]. Dr. Senter also opined Plaintiff needed the freedom to shift positions at will and to take unscheduled breaks of 10-15 minutes, three to four times each shift, and she needed to elevate her legs for a portion of each day [Doc. 15 at 11, 12]. Dr. Senter stated that Plaintiff needed her cane to walk [Doc. 15 at 12]. Dr. Senter's opinion was based on Plaintiff's degenerative disc disease, and it does not mention fibromyalgia. Dr. Senter noted that her opinion was supported by evidence of nerve root compression, neuro-anatomic distribution of pain, limited flexion and extension of the lumbar spine, muscle weakness, signs of motor loss, and a positive straight-leg raising test [Doc. 15 at 13-14].

## IV.    ANALYSIS

Plaintiff's theory of the case is simple. She argues that her condition rapidly deteriorated over a short period of time, but that the ALJ seized on isolated, early notations in the record to find that her impairments were not as severe as she claimed. Phrased in the vocabulary of the SSA regulations, Plaintiff challenges the ALJ's step-two decision and RFC assessment. With respect to step two, Plaintiff challenges the ALJ's failure to include fibromyalgia among her severe impairments. With respect to the RFC assessment, she challenges (1) the ALJ's assessment of her credibility, (2) his evaluation of her subjective complaints of pain, and (3) his decision to credit Dr.

Mullady's opinion over Dr. Smith's opinion. Finally, in the alternative, Plaintiff seeks a remand to the Commissioner for the consideration of additional evidence.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153,

at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the administrative record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Evidence submitted to the court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

### B.    Step-Two Omission of Fibromyalgia

Step two of the sequential evaluation process is a *de minimis* hurdle. *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009). In other words, step two exists only to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). If the bar were set any higher, the sequential evaluation process would itself violate the statutory standard for determining disability. *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). That is because disability is defined as a claimant's inability to work

"considering his age, education, and work experience." 42 U.S.C. § 423(d). At step two, however, the Commissioner has not yet accounted for those factors. *See* 20 C.F.R. § 404.1520(a)(4)(v) (considering those factors at step five). Thus, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Simpson*, 344 F. App'x at 190 (*quoting Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007)). On the other hand, if there is conflicting evidence regarding whether the claimant suffers from an impairment at all, even a minimal one, it is up to the ALJ to resolve that conflict. *See Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 436 (6th Cir. 2010).

The Sixth Circuit Court of Appeals ("Sixth Circuit") has recognized that "fibromyalgia can be a severe impairment." *Rogers*, 486 F.3d at 243. Fibromyalgia is a condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Kalmbach v. Comm'r of Soc. Sec.*, 2011 WL 63602, *7 n.2 (6th Cir. Jan. 7, 2011) (unpublished) (internal quotes omitted). It is difficult to diagnose, because it is a condition without "objectively alarming signs." *Rogers*, 486 F.3d at 243. Although a severe impairment must be shown by "medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 416.908, "normal clinical and test results," such as normal muscle strength and neurological reactions, "are not highly relevant in diagnosing fibromyalgia." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). Instead, the condition is diagnosed by testing a "series of focal points for tenderness"[6] and ruling out other possible causes of pain. *Rogers*, 486 F.3d at 244. Consequently, where a physician has

---

[6] The SSA follows the criteria established by the American College of Rheumatology to determine whether a claimant has the medically determinable impairment of fibromyalgia. Social Security Ruling ("SSR") 99-2p, n.3 (2007). Plaintiff's brief outlines those criteria, which include "[p]ain in 11 of 18 tender point sites on digital palpation" [Doc. 14 at 4].

diagnosed fibromyalgia as the cause of a claimant's impairments, it is error to reject that diagnosis due merely to a lack of "objective" evidence. *See, e.g., Kalmbach*, 2011 WL 63602, at *8.

To recap the evidence of fibromyalgia in this case, the record does contain at least one indirect reference to a "diagnosis" of fibromyalgia (Tr. 526). Plaintiff reported a diagnosis of fibromyalgia by Dr. Kern (Tr. 177), although no such diagnosis appears in the record (Tr. 361). In addition, Dr. Nelson noted an "impression" of fibromyalgia when "all" Plaintiff's muscles were "sore to pressure" (Tr. 523); Dr. Brit believed that Plaintiff's multiple, diffuse tenderness was "suggestive" of fibromyalgia (Tr. 371); and Dr. Musick observed that Plaintiff had "myofascial soft tissue pain to multiple points" (Tr. 400).

The ALJ concluded at step two that "the overall clinical findings do not demonstrate the presence of fibromyalgia" (Tr. 19). In support of that conclusion, the ALJ noted that Plaintiff had reported treatment for fibromyalgia, but he stated that "there is no treatment shown for this specific condition" and "no substantial proof of trigger points to verify the existence of fibromyalgia" (Tr. 19). He specifically addressed Dr. Brit's findings of "multiple diffuse tender points" which were "suggestive" of fibromyalgia, but nonetheless found that the record did not contain a diagnosis of fibromyalgia (Tr. 17, 19). The ALJ was correct to note that the record contains no unequivocal fibromyalgia diagnosis, but the Social Security regulations do not require a claimant to show a "diagnosis" in order to prove her impairment. *See Beavers v. Sec'y of Health & Human Servs.*, 577 F.2d 383, 386 (6th Cir. 1978) (observing that "a person with pain that eludes precise diagnosis" is not "excluded from the protection offered by the Social Security disability system."). The regulations require only that she submit enough evidence from medical sources, including clinical and laboratory findings, to allow the ALJ to determine the nature and severity of her impairment.

[20 C.F.R. § 404.1513(e)](#).

Plaintiff's physicians treated her as though she was afflicted by fibromyalgia, including recommending and prescribing medications for that condition (Tr. 400, 406). Consequently, the ALJ erred in finding that the record showed no treatment of fibromyalgia. Similarly, the ALJ erred in finding "no substantial proof of trigger points." The examinations of Drs. Nelson, Brit, and Musick, while they do not enumerate which trigger points were affected, are evidence of trigger point tenderness and pain. Dr. Nelson's examination, in particular, revealed that "all" Plaintiff's muscles were sore to pressure. Furthermore, while Dr. Kern did not diagnose fibromyalgia, he did rule out Plaintiff's verifiable back impairment as the cause of her pain.[7] *See* [*Rogers*, 486 F.3d at 244](#) (noting that fibromyalgia is confirmed by testing a "series of focal points for tenderness" and ruling out other possible causes of pain). Put simply, the evidence is not so one-sided that the ALJ could reasonably have considered fibromyalgia to be a "totally groundless claim." At the very least, Plaintiff suffered from diffuse pain without a precise diagnosis.

But as the Commissioner points out, the presence of fibromyalgia, or any other disorder for that matter, does not show that the claimant is functionally impaired. *See* [*Higgs v. Bowen*, 880 F.2d 860, 863 (6th. Cir 1998)](#). Here, the ALJ found that even if Plaintiff were afflicted with fibromyalgia, there was no evidence that it caused her any functional limitation. He stated that "the overall clinical findings do not demonstrate . . . that this condition, if present, imposes any work related limitations

---

[7] By referring Plaintiff for continued pain management with Dr. Smith, Dr. Kern acknowledged Plaintiff had painful symptoms requiring ongoing treatment. At the April 6, 2007 appointment, Dr. Kern considered whether that pain might have been caused by her back impairment, in which case surgery might have been an appropriate course of action. Based on Plaintiff's imaging studies and widespread pain, however, Dr. Kern ruled out a condition remediable by surgery as the cause of Plaintiff's pain.

on [Plaintiff's] capacity to work." (Tr. 19). Because of this finding, Plaintiff's arguments regarding step two and the RFC assessment overlap. If the ALJ's finding that fibromyalgia caused no functional limitation was supported by substantial evidence, then the ALJ was justified in concluding fibromyalgia was not among Plaintiff's severe impairments *and* in declining to assess work restrictions based on that condition. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009) (holding that when an ALJ properly considers the degree of functional restriction from an impairment at subsequent steps of the evaluation, any error at step two is harmless). The following analysis, therefore, considers Plaintiff's assignments of error with respect to the ALJ's discussion of the evidence supporting the existence of functional limitations from fibromyalgia—viz., Plaintiff's own testimony and Dr. Smith's opinion, which was based on his pain management treatment of Plaintiff for fibromyalgia and back pain.

## C.    Assessment of Plaintiff's Credibility

Plaintiff challenges separately the ALJ's assessment of her credibility and her subjective complaints of pain, but these inquiries are the same. At the hearing, Plaintiff described symptoms that were severe enough to prevent her from working (Tr. 42). The ALJ acknowledged that Plaintiff's "medically determinable impairments could reasonably be expected to produce [her] alleged symptoms," but he nonetheless found that Plaintiff's complaints of pain were "not credible" to the extent that they were inconsistent with his RFC finding—i.e., that Plaintiff was able to perform a limited range of sedentary work (Tr. 22).

Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984). The ALJ cannot base his credibility finding on intuition, but must give "specific reasons

for the finding on credibility, supported by the evidence in the case record," which are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p (1996); *Rogers*, 486 F.3d at 247-48. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach*, 2011 WL 63602, at *11. According to agency regulations, the ALJ must consider a claimant's credibility in light of all the evidence in the record, including the claimant's own statements regarding the nature and severity of her symptoms, her daily activities, her prior work record, her physicians' medical diagnoses, prognoses, and opinions, her medications and other treatments, and any other relevant factors. SSR 96-7p.

As a preliminary matter, Plaintiff seems to argue that the ALJ should have explained how he considered each of these factors. To the contrary, the ALJ must consider a variety of factors, but he is not required to devote written attention to each piece of evidence he considers. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Instead, the applicable regulations provide that the ALJ must state the reasons for his assessment of the claimant's credibility, and those reasons must themselves be grounded in the record. SSR 96-7p.

Here, perhaps because fibromyalgia cases depend so thoroughly on the claimant's credibility, the ALJ listed no less than six reasons for his assessment of Plaintiff's credibility about her symptoms and pain. He first noted that Plaintiff alleged she was disabled beginning in June 2005, but that the record contained no evidence of treatment between October 2002 and October 2006 (Tr. 22). Plaintiff argues, however, that her condition was deteriorating during this time period. She

complained that her pain began to affect her daily activities in 2004 and was severe enough in 2005 to prevent her from working (Tr. 136-38), and her description of increasing pain was substantiated by her doctors' treatment notes. Dr. Kern noted that Plaintiff's "chronic" pain had gotten worse during the latter half of 2006 (Tr. 209). By January 2007, Dr. Mullady observed that Plaintiff could not walk without a cane and she moved "very slowly . . . with complaints of low back pain." (Tr. 235-36). That same month, Dr. Nelson noted that Plaintiff's back was "tender," and he prescribed a wheelchair (Tr. 279-81). In January 2008, Plaintiff reported numbness in her leg which caused her fall (Tr. 426), and an X-ray at that time showed "severe" narrowing of the disc space at L5-S1 (Tr. 430). Plaintiff is correct that her treatment increased during the pendency of her application for benefits, and the Court notes that Plaintiff did not *file* for disability until November 2006, after she had begun to receive treatment. However, Plaintiff's failure to seek treatment until 2006 is nevertheless inconsistent with her allegation that she was disabled beginning in June 2005, and I **FIND** the ALJ's reasoning in this respect provides support for his credibility assessment.

The ALJ next observed that Plaintiff declined epidural steroid injections and Toradol injections, despite Dr. Nelson's recommendation (Tr. 22). Although Plaintiff did eventually receive injections after they were also recommended by Dr. Kern,[8] she did not receive them until some three months after they were first recommended (Tr. 233, 291), and her initial refusal to accept the treatment lends support to the ALJ's conclusion that her pain was not as severe as she claimed.

Third, the ALJ observed that Plaintiff discontinued physical therapy after one session "against the advice of her physician" (Tr. 22). Plaintiff, however, argues that she did not continue

---

[8] Plaintiff argues that the ALJ failed to mention she received this injection, but the Commissioner points out that elsewhere in the written opinion, the ALJ did in fact acknowledge that Dr. Dreskin administered an epidural injection (Tr. 16).

therapy because it increased her pain. Dr. Kern's recommendation for therapy was made only one month into her treatment, when Dr. Kern was exploring alternatives to surgery (Tr. 211). Physical therapy, along with a back brace and anti-inflammatory medications, was recommended pending "reevaluation" the following month (Tr. 211). At that follow-up appointment, Dr. Kern noted simply that physical therapy had not improved Plaintiff's condition, and he instead arranged for her to receive epidural injections (Tr. 362). Although Plaintiff's decision to stop physical therapy might be explained by increased pain, her failure to attend more than a single session of a treatment designed to help her avoid surgery does provide some support for the ALJ's credibility assessment.

Fourth, the ALJ doubted Plaintiff's credibility because of her reported overuse of pain medication (Tr. 22). The ALJ correctly noted that on one occasion, Plaintiff was taking more than her prescribed dose of Oxycodone and was counseled against doing so in the future (Tr. 396). However, at that same appointment, Plaintiff's physician actually *increased* her dose of Oxycodone, apparently acknowledging that Plaintiff needed the higher dose for pain control (Tr. 396). No physician opined that Plaintiff was engaged at any time in drug-seeking behavior. Accordingly, although the ALJ's factual finding was supported by the record, it provides little support for the ALJ's credibility assessment.

Fifth, the ALJ contrasted Plaintiff's allegation that she was "unable to walk" with a treating physician's note stating she "was able to heel and toe walk easily" (Tr. 22). As Plaintiff argues, the ALJ overstated her testimony. Plaintiff testified she could walk the length of the room, albeit slowly, and could not walk the length of a city block (Tr. 38). The overstatement is of little importance, however, because Plaintiff's testimony is inconsistent with an ability to walk "easily." More importantly, Plaintiff's ability to walk "easily" in November 2006 is inconsistent with an allegation

of total disability beginning in June 2005.

Sixth, on a related note, the ALJ observed that Plaintiff "testified she was prescribed a wheelchair, . . . the record fail[ed] to show a physician recommended a wheelchair." (Tr. 22). Instead, as the ALJ observed, Plaintiff requested a wheelchair (Tr. 16). The ALJ's observation is supported by the record, which shows clearly that Dr. Nelson prescribed a wheelchair at Plaintiff's request: Dr. Nelson wrote that Plaintiff "asks for wheelchair" (Tr. 279). Even conceding that Dr. Nelson believed the wheelchair was medically necessary as one must given the prescription, the ALJ's observation was not error.

As Plaintiff points out, the record contains other evidence supporting her credibility. First, Plaintiff's uninterrupted work history, beginning when she left school in the seventh grade and ending only in 2006 (Tr. 140), lends support to her allegations of disability. *See* SSR 96-7p (stating that ALJ should consider a claimant's prior work history). Plaintiff's longitudinal medical history, as detailed above, shows that she sought a variety of treatments from multiple specialists over a prolonged period of time. *See id.* Furthermore, Plaintiff's treating physician believed her complaints were reasonable in light of his observations and diagnoses (Tr. 621). *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (stating that while an ALJ is ultimately responsible for assessing a claimant's credibility, a physician's opinion in that regard is evidence of the claimant's credibility).[9] Considering the ALJ's thoroughly explained his credibility finding, however, and in light of the deference to which such findings are entitled, I **CONCLUDE** that the credibility assessment was supported by substantial evidence in view of the record as a whole.

---

[9] Two reviewing physicians did find Plaintiff's complaints to be less than fully credible in light of the objective evidence. The ALJ, however, did not give their opinions much weight because they did not examine Plaintiff (Tr. 23).

D.      **Weight Given to Medical Opinions**

In May 2008, Dr. Smith, the pain management specialist who treated Plaintiff for fibromyalgia and degenerative disc disease, offered an opinion of Plaintiff's functional abilities that would have precluded her from working (Tr. 45-46, 623). The ALJ discounted Dr. Smith's opinion, however, giving more weight to Dr. Mullady's January 2007 opinion, which was consistent with sedentary work (Tr. 23, 234).

The contours of the so-called treating physician rule are well drawn. An ALJ is obligated to give "controlling weight" to a treating physician's opinion so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). Even if not entitled to controlling weight, a treating physician's opinion is entitled to weight commensurate with the length of the treating relationship and the frequency of examination, the nature and extent of the treating relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* Furthermore, when the ALJ discounts a treating physician's opinion, he is obligated to give "good reasons" for doing so. *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p). Those reasons must be "supported by the evidence in the case record" and "sufficiently specific to make clear to any subsequent reviewers the weight [given] to the . . . opinion and the reasons for that weight." *Id.*

The ALJ gave two reasons for not giving Dr. Smith's opinion controlling weight and for giving more weight to Dr. Mullady's opinion than to Dr. Smith's. The ALJ found Dr. Smith's opinion was "apparently based on the claimant's subjective complaints" and was not supported by Dr. Smith's own "treatment notes or his findings on examination." (Tr. 23). On the other hand, the

ALJ found Dr. Mullady's opinion to be "consistent with [the ALJ's] own findings and the record as a whole." Plaintiff argues that these are not "good reasons" for the weight given Dr. Smith's opinion.

Taking these reasons in turn, the ALJ believed Dr. Smith's opinion was based on Plaintiff's subjective complaints rather than objective evidence. When a treating physician's opinion is based on a claimant's subjective reports which are themselves not credible, it is not error to assign little weight to the opinion. *Vorholt v. Comm'r of Soc. Sec.*, 2011 WL 310700, *6 (6th Cir. 2011) (unpublished) (affirming rejection of treating physician's opinion which relied on the "false record" supplied by the claimant). Dr. Smith's clinical findings were limited to an initial pain management evaluation in which Plaintiff had tenderness in the spine and decreased sensation in her foot (Tr. 330) and a later examination by an associate who found limited range of motion with pain and "myofascial soft tissue pain to multiple points in her back and paravertebral area basically from the cervical spine down to the lumbar spine" (Tr. 400). Otherwise, Dr. Smith's opinion rests entirely on Plaintiff's self-reported pain, which she described consistently as a ten on a scale of one to ten (e.g., Tr. 328, 332, 394, 397, 402, 404, 407, 409, 411, 413, 417). Dr. Smith's clinical findings, moreover, are themselves based on Plaintiff's pain responses during examination. I **FIND**, therefore, that because the ALJ properly found Plaintiff's subjective complaints to be incredible, Dr. Smith's reliance on those subjective complaints was a good reason to give his opinion less weight.

The second reason offered by the ALJ—that Dr. Mullady's opinion was more consistent with his own findings and the record as a whole—would not by itself constitute a sufficient reason to discount a treating physician's opinion. Such reasoning is simply too vague to satisfy the requirements or the goals of the "good reasons" rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

[541, 544 (6th Cir. 2004)](#) (explaining that the good reasons rule exists so that a claimant can understand the disposition of her claim and so that courts can provide meaningful review of the ALJ's analysis). In this case, however, where the ALJ offered another specific reason for discounting that opinion, and where the ALJ's careful explanation shows he did in fact consider the medical evidence and the contrary opinion evidence, I **FIND** the ALJ gave good reasons for discounting Dr. Smith's opinion.

In sum, I **CONCLUDE** that the findings challenged by the Plaintiff are supported by substantial evidence. Specifically, I **CONCLUDE** that (1) the ALJ properly found Plaintiff did not suffer any functional limitations from fibromyalgia and (2) the ALJ's RFC assessment gave appropriate weight to the medical opinions in the record.

### E. Sentence Six Remand

Finally, Plaintiff has failed to adequately develop her arguments in support for a sentence six remand. She states that she obtained the three medical opinions at issue "only recently," but fails to argue why they are material or why she did not obtain them earlier. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009) (burden of proof is on the claimant to show entitlement to sentence six remand); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277-78 (6th Cir. 2010) (claimant must show the evidence is probative of her condition during the relevant time); *Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001) (claimant must also show that she could not have obtained the evidence earlier, while the administrative record was still open). Accordingly, I **CONCLUDE** Plaintiff has failed to meet her burden to show she is entitled to a remand under sentence six of [42 U.S.C. § 405(g)](#).

## V.    CONCLUSION

For the foregoing reasons, I **RECOMMEND:**[10]

(1)    Plaintiff's motion for summary judgment [Doc. 11] be **DENIED**.

(2)    Plaintiff's motion for sentence-six remand [Doc. 12] be **DENIED**.

(3)    Defendant's motion for summary judgment [Doc. 16] be **GRANTED**.

(4)    The Commissioner's decision denying benefits be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.[11]


                                        s/ *Susan K. Lee*
                                        SUSAN K. LEE
                                        UNITED STATES MAGISTRATE JUDGE

---

[10]    Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[11] This document contains hyperlinks to other documents. Such links are provided for the user's convenience only, and the Court does not guarantee their functionality or accuracy. Any link which directs the user to a document other than the document cited in the text will not supersede the textual citation. The Court does not endorse the content of, or any provider of, any document maintained by any other public or private organization.